```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
RAYMOND BONNER,                                                         :
                                                                        :
                                                                        :
                            Plaintiff,                                  :
                                                                        :        19-CV-9762 (JMF)
              -v-                                                       :
                                                                        :        OPINION AND ORDER
CENTRAL INTELLIGENCE AGENCY et al.,                                     :
                                                                        :
                            Defendants.                                 :
                                                                        :
------------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

      Raymond Bonner, an investigative journalist and author preparing a documentary in connection with the twentieth anniversary of the September 11, 2001 terrorist attacks, sues the Central Intelligence Agency ("CIA") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  He seeks records relating to the "Manchester Manual," an al Qaeda training manual that law enforcement recovered from the home of an al Qaeda suspect in Manchester, England, in 2000, and the CIA later used in developing the "enhanced interrogation techniques" it applied to certain detainees following the September 11th attacks.  The CIA identified sixty-six documents as responsive to Bonner's FOIA request, of which it released twenty-eight in part and withheld thirty-eight in full.  Only three documents remain in dispute, two of which the CIA withholds primarily on national security grounds and one of which the CIA withholds exclusively on the basis of the deliberative process privilege.  Upon review of cross-motions for summary judgment, the Court approves the CIA's withholding of the first two documents but finds that its invocation of the deliberative process privilege as to the third is without basis.

## LEGAL STANDARDS

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  To that end, "virtually every document generated by [a government] agency is available to the public in one form or another, unless it falls within one of [FOIA's] nine exemptions." *ACLU v. Nat'l Sec. Agency* ("*ACLU IV*"), 925 F.3d 576, 588 (2d Cir. 2019) (internal quotation marks omitted).  The exemptions are "narrowly construed," and the agency "bears the burden of demonstrating that any claimed exemption applies." *Nat'l Council of La Raza v. Dep't of Just.*, 411 F.3d 350, 356 (2d Cir. 2005).  The exemptions notwithstanding, an agency must produce any non-exempt portions of a record that are "reasonably segregable" from portions that are exempt.  5 U.S.C. § 552(b).  Further, as amended in 2016, FOIA now provides that "[a]n agency shall . . . withhold information . . . only if . . . the agency reasonably foresees that disclosure would harm an interest protected by an exemption," unless the information is prohibited from disclosure by law or otherwise exempt from disclosure by statute.  5 U.S.C. § 552(a)(8)(A).  As this Court has previously held, that provision "imposes an independent and meaningful burden on agencies" as to discretionary withholdings. *NRDC v. U.S. Env't Prot. Agency* ("*NRDC II*"), No. 17-CV-5928 (JMF), 2019 WL 4142725, at *5 (S.D.N.Y. Aug. 30, 2019) (cleaned up), *reconsideration denied,* 2019 WL 6467497 (S.D.N.Y. Dec. 2, 2019).

Three exemptions are relevant here.  First, Exemption 1 protects materials "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1)(A).  As relevant here, Executive Order 13,526 provides such

protection for certain information pertaining to "intelligence activities (including covert action)" or "intelligence sources or methods." Exec. Order No. 13,526, 75 Fed. Reg. 707, 708 (Jan. 5, 2010). Second, Exemption 3 shields materials "specifically exempted from disclosure by statute," provided that the withholding statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue[] or . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). As relevant here, the National Security Act of 1947 ("National Security Act"), as amended, mandates that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1); *see C.I.A. v. Sims*, 471 U.S. 159, 167-68 (1985) (holding that "§ 102(d)(3) qualifies as a withholding statute under Exemption 3"). Thus, "[f]or information which may disclose intelligence sources and methods, Exemption 3 and the National Security Act provide overlapping protection with Exemption 1." *ACLU v. F.B.I.* ("*ACLU I*"), 59 F. Supp. 3d 584, 594 (S.D.N.Y. 2014) (cleaned up) (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 736 n.39 (D.C. Cir. 1981)).

Third and finally, Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C § 552(b)(5). "This exemption incorporates into . . . FOIA all the normal civil discovery privileges, including traditional common law privileges against disclosure such as the . . . deliberative process privilege[]." *ACLU IV*, 925 F.3d at 589 (cleaned up). The deliberative process privilege protects documents that are both "(1) 'predecisional,' *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) 'deliberative,' *i.e.*, actually related to the process by which policies are formulated." *Nat'l Council of La Raza v. Dep't of Just.*, 411 F.3d 350, 356 (2d Cir. 2005) (cleaned up). To establish that a document is

3

predecisional, an agency "need not show *ex post* that a decision was made" in connection with or reliance on the document, but "it must be able to demonstrate that, *ex ante*, the document for which executive privilege is claimed related to a specific decision facing the agency." *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 80 (2d Cir. 2002) (Sotomayor, J.) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975)). "[A] document which is merely peripheral to actual policy formation" is not predecisional for purposes of the deliberative process privilege; instead, to fall within the ambit of the privilege, "the record must bear on the formulation or exercise of policy-oriented judgment." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (internal quotation marks omitted). Meanwhile, to determine whether a record is "deliberative," courts consider "whether the document (i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." *Id.* (cleaned up).

Even when otherwise properly invoked, FOIA's exemptions are not absolute. As relevant here, "[w]hen an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *N.Y. Times v. C.I.A.*, 965 F.3d 109, 115-16 (2d Cir. 2020) (internal quotation marks omitted). In the Second Circuit, a "precise and strict test" applies to such claims of official acknowledgement with respect to classified information. *Id.* at 116. "Classified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) is as specific as the information previously released, (2) matches the information previously disclosed, and (3) was made public through an official and documented disclosure."

4

*Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir. 2009) (cleaned up).[1]  The "specificity and matching prongs" of the test "work together to form the crux of the official disclosure doctrine: disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure."  *Osen*, 969 F.3d at 110 (internal quotation marks omitted).

In general, FOIA actions filed in court are resolved through summary judgment motion practice.  *See, e.g.*, *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 190-91 (2d Cir. 2012) (quoting *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994)).  "In resolving summary judgment motions in a FOIA case, a district court proceeds primarily by affidavits in lieu of other documentary or testimonial evidence . . . ."  *Id.* at 190.  As the Second Circuit has explained, "[s]ummary judgment is warranted . . . when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).  Although the agency's determination that requested information falls within a FOIA exemption is reviewed *de novo*, *see* 5 U.S.C. § 552(a)(4)(B); *Dep't of Air Force v. Rose*, 425

---

[1] Bonner contends that, in applying the official disclosure doctrine, "[t]he issue for the Court . . . is whether the CIA's conclusory explanations logically and plausibly demonstrate that the withheld information remains properly classified."  ECF No. 45 ("Pl.'s Mem. & Opp'n"), at 12 (internal quotation marks omitted).  That argument is foreclosed by Second Circuit precedent holding that "whether information is or is not properly classified plays no independent role in the official disclosure doctrine analysis."  *Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 113 (2d Cir. 2020).  Instead, "[t]he relevant considerations are the three prongs of the *Wilson* test."  *Id.*; *see also Open Soc'y Just. Initiative v. Dep't of Def.*, No. 20-CV-5096 (JMF), 2021 WL 3038528, at *4 n.2 (S.D.N.Y. July 15, 2021) (noting that the Second Circuit "has questioned the provenance and soundness of the *Wilson* test," but it "remains the law of this Circuit" (internal quotation marks omitted)).

U.S. 352, 379 (1976), the affidavits submitted by the agency in support of its determination "are accorded a presumption of good faith," *Carney*, 19 F.3d at 812 (internal quotation marks omitted). This is particularly true in the national security context, where courts are to give the affidavits or declarations "substantial weight." *Osen*, 969 F.3d at 115. Ultimately, "the agency's justification" for whatever information was withheld "is sufficient if it appears logical and plausible." *ACLU v. U.S. Dep't of Def.* ("*ACLU III*"), 901 F.3d 125, 133-34 & n.9 (2d Cir. 2018), *as amended* (Aug. 22, 2018).

## BACKGROUND

On May 15, 2019, Bonner submitted FOIA requests to the CIA and the Federal Bureau of Investigation ("FBI") seeking "[a]ll [CIA and FBI] records — including, but not limited to, all cables, emails, memoranda, and other communications — pertaining to the al Qaeda Manual (also known as the Manchester Manual)." ECF No. 7 ("Compl."), ¶¶ 13, 18. On May 22, 2019, the FBI informed Bonner that the agency had "conducted a search of the places reasonably expected to have records" and was "unable to identify law enforcement and/or administrative records responsive to the request." *Id.* ¶ 19 (brackets omitted). On June 13, 2019, the CIA responded that Bonner's request did not meet the criteria for expedited processing. *Id.* ¶ 15. On October 22, 2019, after exhausting his administrative remedies, Bonner filed this action against the CIA and the FBI. *Id.* ¶¶ 17, 21; *see* ECF No. 1.[2] Between February 2020 and February 2021, the CIA identified sixty-six documents responsive to Bonner's request. ECF No. 42 ("Blaine Decl."), ¶ 8. Of these, it released twenty-eight documents in part and withheld thirty-eight documents in full. *Id.* ¶¶ 8, 10.

---

[2] The FBI subsequently released in part twenty pages of records responsive to Bonner's FOIA request. *See* ECF No. 28. Bonner does not challenge any aspect of the FBI's response.

Only three documents remain in dispute.[3] First, Bonner challenges the partial withholding of a document comprised of a routing sheet, a memorandum titled "Resistance Techniques used by Abu Zubayda," and a paper by Dr. James E. Mitchell and Dr. John B. Jessen (psychologists involved in the creation of the CIA's "enhanced interrogation techniques") titled "Recognizing and Developing Countermeasures to Al Qaeda Resistance Techniques: A Resistance Training Perspective," to which the Court (following the parties) refers collectively as the "Mitchell Report." Blaine Decl. ¶ 12; *see* ECF No. 47-1 ("Mitchell Rep."). The CIA withholds portions of the Mitchell Report pursuant to Exemptions 1 and 3. Blaine Decl. ¶ 12. Second, Bonner challenges the withholding in full of a nine-page document comprised of a one-page email chain and eight-page cable containing a classified counterterrorism intelligence report, to which the Court (again, following the parties) will refer collectively as the "Classified Cable Correspondence." *Id.* ¶ 11. The CIA withholds the Classified Cable Correspondence pursuant to Exemptions 1, 3, and 5. *Id.* Finally, Bonner challenges the withholding in full of a thirty-one page "draft collection of references to and quotations from open source reporting on various topics related to global terrorism," which contains "extensive markings in track changes," to which the Court (once again, following the parties) will refer as the "Draft Intelligence Report." *Id.* The CIA withholds the Draft Intelligence Report solely pursuant to Exemption 5. *Id.* The CIA's justification for its challenged withholdings is set forth in three declarations: an initial, twenty-two page declaration from Vanna Blaine, a CIA Information Review Officer, *see* Blaine Decl.; a supplemental, twenty-page declaration from Blaine, *see* ECF

---

[3]  All three documents contain redactions of certain names and the like. *See* Blaine Decl. ¶¶ 19, 25. Bonner does not challenge these redactions, *see* Pl.'s Mem. & Opp'n 1 n.1, so the Court need not and does not address them further.

7

No. 47 ("Blaine Supp. Decl."); and a third, classified declaration from Blaine that the CIA submitted for the Court's *in camera* review, *see* ECF No. 48.

## DISCUSSION

Upon review of the CIA's declarations, the Court concludes that the CIA's withholding of the Mitchell Report and the Classified Cable Correspondence is adequately supported by the Blaine declarations but that the CIA has not met its burden with respect to its withholding of the Draft Intelligence Report. The Court will address each document in turn.

### A.  The Mitchell Report

The CIA satisfies its burden of establishing that the redacted portions of the Mitchell Report are exempt from disclosure pursuant to Exemptions 1 and 3. The unredacted portions of the Mitchell Report include segments of a paper by Mitchell and Jessen, who used the Manchester Manual as their "primary reference" for the paper. Mitchell Rep. 6.[4] The paper describes the resistance training offered to al Qaeda operatives, listing specific techniques described in terrorist training manuals, including the Manchester Manual. *Id.* at 6-7. It then offers an analytical framework for counteracting these techniques: According to Mitchell and Jessen, al Qaeda operatives are trained to stay within a metaphorical "circle" of topics that correspond to "pre-coordinated cover stories," so an interrogator's "job is to move the captive outside the circle and into discussions related to intelligence requirements." *Id.* at 8. The paper also addresses "countermeasures" that can be used "to distract captives from the primary focus of the interrogation, lead them to believe that it is futile to continue resisting, or gradually shape compliance." *Id.* at 9. These sections of the paper are largely redacted. Also included in the

---

[4]   Citations to the Mitchell Report refer to the page numbers automatically generated by the Court's ECF system.

Mitchell Report is a January 10, 2003 memorandum describing Mitchell and Jessen's analysis of resistance techniques that CIA detainee Abu Zubaydah allegedly used when he was interrogated between April and mid-August 2002. *Id.* at 3-4. The memorandum concludes that "Abu Zubayda [sic] used all of the techniques" outlined in Mitchell and Jessen's paper. *Id.* at 3.

The CIA logically and plausibly avers that the redacted portions of the Mitchell Report "contain discussion of classified CIA sources and methods," including "classified analyses" of the interrogation resistance techniques described in al Qaeda training manuals and of "their use in interrogation, including responding to their use with countermeasures and guidance concerning the creation of such countermeasures." Blaine Decl. ¶ 12. The CIA determined that this information was properly classified because its release "could benefit [the] CIA's adversaries by allowing them to understand and develop responses to CIA interrogation practices, including ways to evade or mislead questioners." *Id.* ¶ 16. For the same reasons, the CIA establishes that material redacted from the Mitchell Report is shielded from disclosure under Exemption 3 in light of the National Security Act. *Id.* ¶ 20. The CIA conducted a line-by-line review of the Mitchell Report and concluded that no additional, non-exempt information can be segregated and released. *Id.* ¶¶ 10, 13, 27.

Bonner speculates that the information redacted from the Mitchell Report has previously been officially disclosed by the CIA, "[g]iven all that is known" about the enhanced interrogation techniques that Mitchell and Jessen developed and that the CIA used against detainees in the months and years following the September 11th terrorist attacks. ECF No. 51 ("Pl.'s Reply"), at 6. More specifically, he argues that the official disclosure doctrine requires the release of any information redacted from the Mitchell Report that (1) identifies or describes the enhanced interrogation techniques proposed by Mitchell and Jessen that were approved for

9

use on CIA detainees, beginning with Abu Zubaydah; (2) discusses the theory of "learned helplessness," which posits that "brutal countermeasures would render a detainee powerless and feeling helpless to resist the interrogator"; (3) attributes authorship of the Manchester Manual to Zubaydah; or (4) reflects the date on which Mitchell and Jessen's paper was written.  Pl.'s Mem. & Opp'n 12-15; *see* ECF No. 44 ("Bonner Decl."), ¶¶ 21-22, 24-25, 27-38.[5]  In response, the CIA represents that the material redacted from the Mitchell Report "does not discuss or reference" enhanced interrogation techniques, "any of the techniques discussed in the Bonner Declaration or the exhibits attached thereto," "the term 'learned helplessness,'" or the use of any "interrogation techniques to cause helplessness or the inability to resist in a detainee."  Blaine Supp. Decl. ¶¶ 16-17.  Further, the CIA avers, the redacted information "does not contain any discussion of the authorship of the Manchester Manual, by Abu Zubaydah or anyone else," and Mitchell and Jessen's paper "is undated."  *Id.* ¶¶ 18-19.

   Selectively quoting from the CIA's memorandum of law, Bonner accuses the CIA of adopting "an overly literal" interpretation of his official disclosure argument.  Pl.'s Reply 5 n.3.  Specifically, he speculates that information redacted from the Mitchell Report might be substantively identical to information regarding "enhanced interrogation techniques" or "learned helplessness" that the CIA previously disclosed, even without using those precise terms.  *Id.* at 5-6 & n.3.  Although Bonner is correct that the focus of the *Wilson* test is on the degree of substantive similarity between information that the agency has officially acknowledged and withheld information, *see Osen*, 969 F.3d at 110-12, a review of the CIA's supplemental

---

[5] The parties dispute whether some of the disclosures to which Bonner points are even "official" disclosures.  *See* ECF No. 46 ("Def.'s Opp'n & Reply"), at 10-12; Pl.'s Reply 3-5.  In light of the Court's conclusion that none of the prior disclosures that Bonner identifies appears to match the information redacted from the Mitchell Report, the Court need not and does not resolve this dispute.

declaration makes clear that the CIA has understood and applied this standard correctly. The CIA states in its declaration that the information redacted from the Mitchell Report does not pertain to "any of the [interrogation] techniques" that Bonner identified as having been previously disclosed or the use of any interrogation techniques "to cause . . . the inability to resist in a detainee," regardless of whether the terms "enhanced interrogation techniques" or "learned helplessness" were used to describe these topics. Blaine Supp. Decl. ¶¶ 16-17. Put simply, Bonner does not "point[] to specific information in the public domain that appears to duplicate that being withheld." *Osen*, 969 F.3d at 111 (internal quotation marks and emphasis omitted). This conclusion is bolstered by the Court's *in camera* review of the CIA's classified declaration, which contains "more detailed information about the substance of the classified information contained in [the Mitchell Report]." Blaine Supp. Decl. ¶ 13; *see* ECF No. 48.

### B. The Classified Cable Correspondence

The CIA also satisfies its burden of establishing that the Classified Cable Correspondence is exempt from disclosure in its entirety pursuant to Exemptions 1, 3, and 5. As noted, the Classified Cable Correspondence consists of an eight-page classified counterterrorism intelligence report and a one-page email chain. Blaine Decl. ¶ 11. The report "describes in detail [CIA] and U.S. government intelligence-collection capabilities regarding the subject of the document," and it "incorporates a variety of sensitive information from [the] CIA and other U.S. government agencies," *id.*, "including the identification of sources and other sensitive methods used by the CIA," *id.* ¶ 16. The email chain also contains classified information. *Id.* ¶ 11. The CIA determined that the classification of information in both documents was proper because its release "could benefit a foreign intelligence service or terrorist organization by enabling it to identify particular CIA sources, circumvent CIA monitoring efforts, and generally enhance its

intelligence or deception activities at the expense of the United States," and would "reveal targets of [the] CIA's intelligence collection efforts, allowing adversaries to thwart them or make collection more difficult to accomplish." *Id.* ¶ 16.  For the same reasons, portions of the Classified Cable Correspondence discussing CIA sources and methods are shielded from disclosure under Exemption 3 and the National Security Act.  *Id.* ¶ 20.

To the extent that portions of the Classified Cable Correspondence do not discuss CIA sources and methods, and Exemptions 1 and 3 do not apply, the CIA logically and plausibly avers that they "reflect[] pre-decisional inter- and intra-agency deliberations," including "recommendations from an outside agency to [the] CIA," "recommendations from a[] [CIA] office to [CIA] leadership," and "views as to the possible causes of and potential responses to particular situations."  *Id.* ¶¶ 11, 21 & n.4.  Additionally, the Court concludes that the CIA satisfies FOIA's foreseeable harm requirement.  To be sure, the agency's public explanation of the latter — that, "[i]f proposals or suggestions such as those reflected in [the Classified Cable Correspondence] were subject to disclosure, government personnel would not feel comfortable providing or requesting candid advice, for fear that such advice could be released to the public and potentially contradict or undermine the decision or approach actually taken," *id.* ¶ 23 — is somewhat thin.  *See, e.g.*, *NRDC II*, 2019 WL 4142725, at *5 (noting that, in light of the foreseeable harm requirement, an agency must generally justify its discretionary withholdings by "demonstrat[ing] a logical relationship between the *specific* decisionmaking processes involved and the harms that the privilege guards against" (emphasis added)); *NRDC v. U.S. Env't Prot. Agency* ("*NRDC I*"), No. 17-CV-5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019) (noting that "boiler plate statements to the effect that disclosure could have a chilling effect on agency deliberations or discourage a frank and open dialogue among interagency staff" do not

generally suffice (cleaned up)).  But "[t]he degree of detail necessary to substantiate a claim of foreseeable harm is context-specific" and, "[i]n some instances, the withheld information may be so obviously sensitive . . . that a simple statement illustrating why the privilege applies and identifying the harm likely to result from release may be enough."  *Rosenberg v. U.S. Dep't of Def.*, 442 F. Supp. 3d 240, 259 (D.D.C. 2020) (internal quotation marks omitted); *see also Reps. Comm. for Freedom of the Press v. F.B.I.*, — F.4th — , No. 20-5091, 2021 WL 2753938, at *14 (D.C. Cir. July 2, 2021) (holding that "[t]he very context and purpose" of email communications between the FBI Director and "high-ranking FBI officials" regarding an ongoing "policy crisis" over the FBI's undercover impersonation policy "make the foreseeability of harm manifest").  Here, as the CIA explains, the classified nature of the intelligence report contained within the Classified Cable Correspondence makes it impossible to describe its "specific subject matter . . . on the public record without revealing exempt information."  Def.'s Opp'n & Reply 7; *see also* Blaine Supp. Decl. ¶ 10.  In light of that explanation, and the Court's review *in camera* of the CIA's classified declaration containing "more detailed information about the substance of [the Classified Cable Correspondence]," Blaine Supp. Decl. ¶ 10; *see* ECF No. 48, the Court concludes that the CIA meets its burden of establishing that any reasonably segregable, non-classified portions of the Classified Cable Correspondence are subject to the deliberative process privilege.  *See* Blaine Decl. ¶¶ 10, 13, 27.

### C.  The Draft Intelligence Report

By contrast, the CIA fails to establish that the Draft Intelligence Report is subject to the deliberative process privilege because it fails to identify any agency decision-making process in connection with which the document was created.  The Draft Intelligence Report is a draft of a "Terrorism Open Source Intelligence Report [that] was prepared on a weekly basis" for the

director of the CIA's Counterterrorism Center, "ultimately for the background use by members of the intelligence and law enforcement communities in carrying out their duties." Blaine Supp. Decl. ¶ 25. It includes "summaries of and key quotations from open-source publications." *Id.* ¶ 7. Notably, the CIA did not locate a final version of the Draft Intelligence Report, which it withholds solely pursuant to Exemption 5. Blaine Decl. ¶ 11. That is, the CIA does not contend that any portion of the Draft Intelligence Report is classified or otherwise exempt from disclosure on any basis other than the deliberative process privilege.

To the extent that the CIA contends that the Draft Intelligence Report is predecisional simply by virtue of its status as a draft, the Court is unpersuaded. *See* ECF No. 41 ("Def.'s Mem."), at 14-15; Def.'s Opp'n & Reply 16-19. As noted, it is well established that the deliberative process privilege protects only "record[s] [that] bear on the formulation or exercise of policy-oriented judgment." *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks omitted). Plainly, not all draft documents produced by an agency meet that standard. Thus, although the CIA may be correct that draft documents are often predecisional, *see* Def.'s Mem. 15; Def.'s Opp'n & Reply 16, a document's "draft status alone . . . does not lead to a per se exemption," *Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 518 (S.D.N.Y. 2010); *accord U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021); *Reps. Comm. for Freedom of the Press*, 2021 WL 2753938, at *10; *Techserve All. v. Napolitano*, 803 F. Supp. 2d 16, 27 (D.D.C. 2011).

Meanwhile, the CIA's assertion that the Draft Intelligence Report is predecisional because it was intended "to guide the policy judgments of the CIA and other intelligence and law enforcement personnel" who would receive the final report, Blaine Supp. Decl. ¶ 23, fails to provide the requisite "reasonably detailed explanation[]" as to why Exemption 5 applies. *N.Y.*

*Times*, 965 F.3d at 114 (internal quotation marks omitted).  At a minimum, to properly invoke Exemption 5, an agency "must be able to demonstrate that, *ex ante*, the document for which [deliberative process] privilege is claimed related to a *specific* decision facing the agency." *Tigue*, 312 F.3d at 80 (emphasis added); *see also Brennan Ctr. for Just. at N.Y.U. Sch. of L. v. U.S. Dep't of Just.*, 697 F.3d 184, 202 (2d Cir. 2012) (noting that a document may be predecisional if its "contents confirm that the document was originated to facilitate an *identifiable* final agency decision" (emphasis added) (internal quotation marks omitted)).  Merely stating that a document may have informed the exercise of policy judgment on any of the decisions facing intelligence and law enforcement personnel, as the CIA does here, does not meet that standard.

      The cases on which the CIA primarily relies do not call for a different result.  In each case, the court identified the decision-making process to which the relevant document related.  *See* Def.'s Mem. at 14-15; Def.'s Opp'n & Reply 16-19.  For example, in *Sierra Club*, the Environmental Protection Agency's draft biological opinion addressed the likely effect on endangered species of a proposed administrative rule.  *See* 141 S. Ct. at 783-84, 786.  In *ACLU v. United States Department of Justice* ("*ACLU II*"), 844 F.3d 126 (2d Cir. 2016), a draft op-ed article described "ways of explaining the Government's legal reasoning in support of drone strikes."  *Id.* at 133.  Meanwhile, in *Color of Change v. United States Department of Homeland Security*, 325 F. Supp. 3d 447 (S.D.N.Y. 2018), the Department of Homeland Security had produced "drafts of a proposed intelligence assessment" regarding trends in "violent, terrorist acts . . . driven by race-related extremist ideologies of various stripes," in order to "provide guidance for DHS actions and intelligence collection efforts against violent extremist actors."  *Id.* at 451, 453 (internal quotation marks omitted).  And, notably, the court did not conclude that

Exemption 5 applied based solely on "that description," but also on the court's *in camera* review. *Id.* at 453. Arguably, the most helpful case for the CIA's position is *National Security Archive v. C.I.A.*, 752 F.3d 460 (D.C. Cir. 2014) (Kavanaugh, J.), in which the D.C. Circuit reaffirmed that an agency's draft official history is predecisional, reasoning in part that an agency's official history "helps educate future agency decisionmakers" in the same way that a document like the Draft Intelligence Report might educate its eventual recipients. *Id.* at 463. But an agency's official history also "constitutes the agency's 'official statement' concerning the agency's prior actions," *id.*, and "make[s] recommendations for policy changes going forward," *Reps. Comm. for Freedom of the Press*, 2021 WL 2753938, at *8, and is thus readily distinguishable from a collection of open-source reporting for general "background use" by government personnel, Blaine Supp. Decl. ¶ 25; *cf. NRDC II*, 2019 WL 4142725, at *8 (addressing the application of the deliberative process privilege to an agency's communications explaining its policy decisions). In short, none of the cases cited by the CIA hold that a document can be predecisional merely because it could have informed unspecified policy decisions that agency personnel might face in the future.

Because the CIA fails to establish that the Draft Intelligence Report is predecisional, its motion for summary judgment must be and is denied with respect to that document. *See, e.g.*, *Leopold v. U.S. Dep't of Just.*, 411 F. Supp. 3d 1094, 1106, 1108 (C.D. Cal. 2019) (denying the agency's motion for summary judgment to the extent that the agency "fail[ed] to identify the decision that [the] documents preceded"); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 955 F. Supp. 2d 4, 18 (D.D.C. 2013) (concluding that the court was "simply unable to pass

on [the agency's] deliberative-process claims" because the agency failed to specify "the deliberative process involved" or "the role played by the documents in that process").[6]

## D. *In Camera* Review

Finally, Bonner argues that *in camera* review of the documents at issue is warranted, for two principal reasons: first, because the CIA has produced documents and portions of documents that it previously withheld over the course of this litigation, casting doubt on the propriety of its remaining withholdings; and second, because controversy surrounding the CIA's use of "enhanced interrogation techniques" suggests that the CIA may be withholding non-exempt material to avoid public embarrassment. *See* Pl.'s Mem. & Opp'n 24-25; Pl.'s Reply 1-3.

With respect to Bonner's first rationale, this Court has previously declined to "hold against [an agency] the fact that it revisited records it had already reviewed and reconsidered earlier exemption determinations in the face of continued challenges from the [plaintiff]," reasoning that such thoughtful reconsideration is "the way the FOIA process should work." *NRDC v. U.S. Env't Prot. Agency* ("*NRDC III*"), No. 17-CV-5928 (JMF), 2020 WL 6891537, at *4 (S.D.N.Y. Nov. 24, 2020). A contrary holding "would disincentivize reconsiderations by agencies, thereby undermining the ultimate goal of promoting the disclosure of records where an exemption does not apply." *Id.* As for Bonner's conjecture that the CIA may be withholding documents because of their potential to embarrass the CIA, it is well established that "speculative assertions are insufficient to rebut the presumption [of good faith] accorded to agency affidavits." *Reynolds v. United States*, 350 F. App'x 474, 475 (2d Cir. 2009) (summary

---

[6] In light of this conclusion, the Court need not and does not address Bonner's arguments that the Draft Intelligence Report contains segregable, non-deliberative material and that the CIA fails to establish that foreseeable harm would result from its disclosure. *See* Pl.'s Mem. & Opp'n 22; Pl.'s Reply 9.

order) (citing *Grand Cent. P'ship*, 166 F.3d at 489); *accord Jones-Edwards v. Appeal Bd. of Nat'l Sec. Agency*, 196 F. App'x 36, 37-38 (2d Cir. 2006) (summary order) (quoting *Carney*, 19 F.3d at 812-13).  In FOIA cases, "[*i*]*n camera* review is considered the exception, not the rule." *Halpern v. F.B.I.*, 181 F.3d 279, 295 (2d Cir. 1999) (internal quotation marks omitted); *accord NRDC III*, 2020 WL 6891537, at *3.  Here, Bonner fails to justify resort to that exception.

## CONCLUSION

For the foregoing reasons, the CIA's motion for summary judgment is GRANTED and Bonner's cross-motion for summary judgment is DENIED with respect to the Mitchell Report and the Classified Cable Correspondence.  By contrast, the CIA's motion is DENIED and Bonner's cross-motion is GRANTED with respect to the Draft Intelligence Report, which the CIA shall disclose to Bonner **within one week of the date of this Opinion and Order**.

The Clerk of Court is directed to terminate ECF Nos. 40 and 43; to enter judgment consistent with this Opinion and Order; and to close this case.

SO ORDERED.

Dated: July 28, 2021
New York, New York

JESSE M. FURMAN
United States District Judge